BLAKELY v. FIDELITY MUT. LIFE INS. CO.

(Circuit Court, E. D. Pennsylvania. February 21, 1906.)

No. 65.

1. INSURANCE—ANTICIPATORY BREACH OF LIFE INSURANCE CONTRACT—ELECTION.

In case an assessment life insurance company commits an anticipatory breach of its contract with a policy holder by making a higher assessment against his policy than is authorized by the contract, and by announcing its intention to continue to do so, the insured has his election to accept such action as a rescission of the contract and sue for the breach, or to refuse to rescind, and continue to treat the contract as in force; but such election, when once made, is final, and where he elects to keep the contract in force by tendering payment of the amount lawfully due thereon, he is concluded thereby, and cannot thereafter rescind on account of such breach.

2. SAME—ACTS CONSTITUTING BREACH—RIGHT OF RESCISSION.

The fact of a difference of opinion between a policy holder in an assessment life insurance company and the officers of the company with respect to the construction of the contract, and that the officers were making assessments at a higher rate than warranted, but in accordance with the contract as they understood it, did not constitute an anticipatory breach by the company which entitled the policy holder to rescind.

3. SAME—RECOVERY OF ASSESSMENTS—INTEREST.

An assessment life insurance company, which merely collects assessments from its policy holders, and disburses the same in payment of matured death claims, is not liable for interest on assessments paid in by a policy holder and recovered by him on a rescission of the contract.

At Law. On motion by defendant for judgment upon reserved point notwithstanding the verdict.

W. C. Blakely, G. H. Stein, and W. B. Linn, for plaintiff.
Ira J. Williams and Simpson & Brown, for defendant.

J. B. McPHERSON, District Judge. After the taking of evidence in this case had been finished, it was agreed by counsel that there were no disputed facts for the jury; whereupon a verdict was directed to be entered in favor of the plaintiff, with leave to the court to reduce the amount thereof as might thereafter seem proper, subject also to the customary reservation, whether there was any evidence to go to the jury in support of the plaintiff's claim. Under this convenient practice in the Pennsylvania courts, any question of law can now be considered and decided that affects the plaintiff's right to recover, either in whole or in part.

Some of the uncontroverted facts appear in the following extract from a brief that was prepared by the defendant's counsel for use upon an earlier motion made by the plaintiff for judgment for want of a sufficient affidavit of defense:

"The defendant was incorporated on December 2, 1878, under the act of assembly of the state of Pennsylvania, approved May 1, 1876, P. L. 53. Section 37 of that act provide as follows:

"'Section 37. Companies insuring lives on the plan of assessments upon surviving members may be organized in the same manner as provided in this act for the organization of mutual fire insurance companies, and the provisions of the act to which this is a supplement shall not apply to said

companies, and companies heretofore organized, if their business is transacted in accordance with the provisions of their respective charters, whether with or without capital stock, guarantee capital or accumulated reserve in lieu of capital stock: Provided, however, that each of said companies shall be required to exhibit an annual statement to the Insurance Department, which shall be published in the annual report of the Insurance Commissioner, of the amount, if any, of its capital stock, guarantee capital or accumulated reserve in lieu of capital stock, and also of all assets, assessments and liabilities, and to answer such interrogatories as the Insurance Commissioner may require in order to ascertain its character and condition. For this purpose the said Commissioner may at any time institute an examination of the affairs of any such company, as is provided in the case of mutual fire insurance companies by the act to which this is a supplement: Provided, also, that no part of such assessment upon surviving members shall be applied to any other purpose than the payment of death losses unless the amount intended for other purposes is specially stated in the notice of such assessment, and the object, or objects, for which it is intended. Provided, further, that all policies or certificates issued by said companies, shall state that the company issuing the same is not required by law to maintain the reserve which other life insurance companies are required by the act to which this is a supplement.'

"Defendant's charter * * * states the purpose of the defendant corporation to be as follows:

" 'Second. The class of insurance for the transaction of which it is constituted is to insure lives by assessment on the surviving members of the association.'

" 'Third. The plan or principle upon which the business is to be conducted is on the mutual or co-operative principle.'

"On or about December 11, 1879, application was made for a policy upon the plaintiff's life in defendant company. The application for membership contains the following:

" ' * * * We do hereby jointly and severally agree with the association for the benefit of its members to pay the Guarantee Trust & Safe Deposit Company [its successors or legal representatives], trustee for Philadelphia county, state of Pennsylvania, our pro rata proportion according to the age of the insured and the amount of insurance, of all the death losses that occur among the members of the association [during the life of the applicant], provided always, that such pro rata mortality assessment shall not exceed the yearly per cent., named in section 2, article 9 of the association's by-laws, of the amount of insurance above mentioned.'

"On December 13, 1879, a certificate of membership was issued by defendant, reciting among other things that applicant has agreed to pay his annual premiums or dues * * * 'during his lifetime together with his proportion of mortality assessments as agreed and provided in his application,' and providing that the by-laws shall constitute, together with the application of the insured, a part of this contract in the same manner and to the same extent as if they were printed in the body of the policy; and that the association is not required by law to maintain any reserve.

"Article 9 of defendant's by-laws in force at that time, provides as follows:

" 'Sec. 1. For death claims, each member shall pay according to age and amount insured, his or her pro rata share of the mortality assessments.

" 'Sec. 2. The mortality assessments shall not exceed the yearly average of * * * 1½ per cent. between the ages of 45 and 50 years, to be known as class C * * * 2¼ per cent. at the age of 60 years, and until death, to be known as class F, on the amount of insurance held by each member. * * * If the membership commences at the ages and per cent. specified in * * * class C, ¼ to 2¼ per cent. shall be added.' "

Other relevant facts that were proved at the trial are these: the plaintiff was in his 48th year when the policy was issued upon his life, and therefore became a member of class C. He paid assessments

that were levied upon his policy for the payment of death losses from 1879 to 1902, inclusive, aggregating the sum of $2,141.25, the amount paid each year varying from $29.15 to $219; the latter sum having been paid in 1901. During the same period he paid $350 toward the expense account of the company—this sum, however, has no bearing upon the present controversy—and $375.38 toward the contingent fund. The sum paid into the contingent fund could have been used for the purchase of paid-up insurance, but in February 1891, the plaintiff, by a written agreement, waived his right to such a policy, and asked to have the accumulations of his portion of the fund applied to the reducing of his payments on account of the mortality assessments. This was done, and from 1891 to 1902, inclusive, the sum of $420.90 was thus applied.

The defendant's custom was to assess its policies for the payment of death losses three times a year; once for each period of four months. The amount of the assessment was obtained by taking the actuaries', or combined experience, table, which is recognized in Pennsylvania as the standard table (Act May 9, 1889, P. L. 150), calculating the amount with which each policy would be chargeable if the expected number of deaths had occurred according to the table, but assessing against the policy only such proportion of this amount as would meet the actually experienced, instead of the expected, mortality. The method of calculation varied in details during the life of the plaintiff's policy, but the earlier method seems to have been in his favor, and there was no variation to his hurt in the application of the rule just stated. In December, 1902, the plaintiff paid an assessment of $86.15, which was the last call for the year, and on March 2, 1903, he received a notice that the first mortality assessment for the new year was for $99.75, and would be due on April 1st. The plaintiff construed his contract to mean, that he could never be obliged to pay more than $212.50 in any one year; and that, after he had paid whatever smaller sum might be levied upon the policy during a given year, he could never be asked to pay any further sum upon account of his liability for that year. Upon the receipt of the notice in March, he assumed that the total assessments for the year would be at least three times as great as $99.75, and would therefore exceed the maximum amount for which he believed himself to be liable. An interview with the president of the defendant company followed, in which the plaintiff learned, apparently for the first time, that the defendant's construction of the contract differed materially from his own; the president's contention being that the plaintiff's liability was cumulative—meaning by this word, that, as he had agreed to pay his pro rata share of the mortality assessments according to his age and the amount of his policy, and as this share was not to exceed a specified "yearly average," such average could only be calculated by taking the life of the policy as the period during which the average was to be ascertained, and could not be properly calculated by restricting the computation to a single year. In the Company's view, a "yearly average" required of necessity, ex vi termini, that more years than one must be taken into account. Whatever

balance, therefore, of the "yearly average," calculated according to the company's construction of the contract had not been used in any preceding year was regarded by the company as an accumulated liability, which the plaintiff had expressly agreed to pay, and was therefore bound to pay whenever it should be needed and should be called in. The president, therefore, stated to the plaintiff, who was then 72 years old, that his liability would increase year by year as he grew older, because the risk of carrying his policy was growing; and that his assessments would probably go on increasing, the rate of increase being governed by the Pennsylvania mortality tables. The president recommended the plaintiff to substitute a policy on the ordinary, or "old line," plan, but the recommendation was not accepted. On April 1, 1903, the plaintiff, by the hands of an agent, tendered $86.15 to the defendant in payment of the assessment of $99.75, but the tender was refused. No further payment or offer of payment was ever made by the plaintiff, and the policy was accordingly forfeited for nonpayment of assessments. This suit was brought shortly after the plaintiff was notified of the forfeiture and proceeds upon the theory that the declarations of the president constituted a complete anticipatory breach of the contract, and justified the plaintiff in suing to recover the money that he had paid upon the policy. To use the language of the statement of claim, the breach complained of, upon which the plaintiff relies "absolutely and only," as the brief of his counsel informs us, is as follows:

"Whereupon, having received said notice of March 2, 1903, and shortly after receiving it, plaintiff called upon the defendant company, represented by its president, L. G. Fouse, in regard to the increase of said assessment. The defendant, speaking by said Fouse, informed the plaintiff, and the witness who accompanied him, that, according to the system and principles of insurance which the company had adopted, said assessment was correct and proper; and not only that the assessment was correct and proper, but that succeeding annual assessments which the defendant company would make upon the plaintiff would constantly increase, and that each assessment as made would be greater than the assessment immediately preceding it. Defendant, speaking by its president, Fouse, further informed plaintiff that in the course of ten years the assessment upon plaintiff according to the plan of assessment then being followed, would amount to a sum in the neighborhood of $1,000 per year, and would increase annually, and that it was the purpose and intention of the defendant to make such assessments so increasing in amount from year to year. Plaintiff protests that said course so outlined by the defendant is in violation of and in absolute disregard of his rights under his contract of membership, and grossly and iniquitously fraudulent and illegal."

These averments are somewhat stronger than the proof, but for present purposes they are substantially correct. The rules that determine the rights of a person insured, after the company has denounced or improperly forfeited his policy before it becomes due, have been so recently under consideration by this court, and by the Court of Appeals for the Third Circuit, in several cases, that little further discussion is necessary. Assuming for the moment, that the statements of the president amounted to a breach of the contract by anticipation, it seems to me that the dispute is ruled against the plaintiff by Supreme Council v. Lippincott, 134 Fed. 824, 67 C. C. A. 650,

69 L. R. A. 803. In that case, the court of appeals declared some of the principles that govern the subject to be as follows:

"Where one party to a contract to be performed in the future, before the time for performance arrives, refuses to perform, or declares his intention not to perform, he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such renunciation, however, in and of itself does not work a rescission, for one party to a contract cannot by himself rescind it. But by making the wrongful renunciation he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect to such wrongful rescission. L. R. 16 Q. B. Div. 467. A declaration by the promisor, before the time for performance has arrived, of his intention not to perform, is not in itself, and unless acted on by the promisee, a breach of the contract. Such declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect, it becomes a breach of contract, and he can recover upon it as such. Id., 473. In Johnstone v. Milling, L. R. 16 Q. B. Div. 460, 467, Lord Esher, Master of the Rolls, said:

" 'The other party may adopt such renunciation of the contract by so acting upon it as, in effect, to declare that he, too, treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation He cannot, however, himself proceed with the contract on the footing that it still exists for other purposes, and also treat such renunciation as an immediate breach. If he adopts the renunciation, the contract is at an end, except for the purposes of the action for such wrongful renunciation. If he does not wish to do so, he must wait for the arrival of the time when, in the ordinary course, a cause of action on the contract would arise. He must elect which course he will pursue.' "

Under these principles, if the president's declarations amounted to a breach by anticipation, the plaintiff was put to his election. He was at liberty to do either of two things, but he was bound to choose one of them. He might either assent to the breach and sue for the money already paid in, or he might refuse assent and keep the contract alive in order that his beneficiary might profit by its terms in the event of his death. He chose the latter alternative, and tendered so much of the premium as he believed to be due on April 1, 1903, thereby continuing the existence of the policy, at least until another assessment should fall due. If his tender was good, as he intended it to be, and if he had died before the next assessment fell due, his beneficiary would have had an unquestionable right to recover the full amount secured by the policy. And, as I understand Supreme Council v. Lippincott, this election by the plaintiff was final, as a further quotation from the opinion in that case will, I think, make clear. Quoting with approval from Clough v. Railway Co., L. R. 7 Exchr. 26, 34, the court of appeals goes on to say:

"Speaking of the right of election to avoid a sale of personalty, the court there said:

" 'And we further agree that the contract continues valid till the party defrauded has determined his election by avoiding it. And as is stated in Com. Dig. Election, c. 2, if a man once determines his election it shall be determined forever; and as is also stated in Com. Dig. Election, c. 1, the determination of a man's election shall be made by express words or by act. And consequently we agree with what seems to be the opinion of all the judges below that, if it can be shown that the London Pianoforte Company have at any time after knowledge of the fraud either by express words

or by unequivocal acts affirmed the contract, their election has been determined forever.'

"The principle of the finality of an election once made is applicable, we think, to the present case."

If I have correctly apprehended the scope of the decision just cited, it is a complete answer to the plaintiff's claim.

But I think there is a second answer, that is equally complete, namely, that no anticipatory breach whatever was committed. As it seems to me, the situation was simply this: The plaintiff and the defendant's president differed widely concerning the true construction of the by-law that formed a part of the contract, but neither of them-intended to refuse to be bound by the contract, as he understood it. In this respect, the controversy is altogether different from the ordinary case to be found in the books, where the defendant has either denied the existence of any contract at all, or has flatly refused to go on with it. In my opinion, therefore, the plaintiff's suit was at least premature. Even on his own construction of the by-law, he was still bound to pay the difference between $212.50 and $86.50 during the year 1903; and until a larger sum than such difference was demanded from him by the defendant company, he would, upon his own showing, suffer no harm. But if harm should be threatened, if the defendant should demand more than the contract properly allowed to be charged, at least two courses were open to him, by either of which his rights could be effectively preserved. He might either have continued to tender whatever sum he believed to be due under the true construction of the contract; and, if the risk he was thus taking of being correct in his understanding of the by-law should be determined in his favor, his beneficiary would be entitled to recover the full amount of the policy at his death. The better course, however, would have been to avoid this hazard by an appeal to a court of equity setting forth the dispute that existed between himself and the company, pointing out the danger that he ran of having his policy forfeited if he should be mistaken in the proper construction of his contract, and asking the court to determine whether his view or the company's, was correct. I am, of course, outlining merely the substance of what such a bill in equity should contain. Instead, however, of taking either of these courses, he chose to consider the difference of opinion between himself and the president of the defendant company as a breach of the contract, and has brought the present suit upon that theory. It seems to me so clear that no anticipatory breach was committed that I forbear to discuss the subject further.

If, however, I should be wrong in my view of the law, and if the plaintiff should be entitled to recover something, a word or two may be added concerning the subject of interest. The verdict includes a considerable sum upon this account, and, even if it should be allowed to stand for the principal sum paid in, I do not see upon what ground the plaintiff should be permitted to recover interest. The money paid into the company's treasury for mortality assessments was not used for the company's benefit at all, but was at once distributed to the holders of other policies, upon which death losses had been sustained.

The company was merely the hand by which the plaintiff's money was distributed, and did not retain the money and make a profit out of its use. I cannot see, therefore, a sufficient reason for compelling the payment of interest.

But, if either of the grounds referred to in the foregoing opinion is well taken, the plaintiff has no right to recover either principal or interest, and, as I believe that both are sound, I direct judgment to be entered upon the reserved point in favor of the defendant, notwithstanding the verdict.